## Couch et al. v. Vanhoose.

November 10, 1950.

S. M. Ward, Judge.

Faulkner & Faulkner for appellants.
Napier & Napier for appellee.

Judge Rees—Reversing.

Clyde Vanhoose sued Bill Couch and Alonzo Burns, policemen of the City of Hazard, for false arrest. The jury returned a verdict for $1,000 against each of the defendants, and they and the two sureties on Alonzo Burns' bond have appealed. Appellants urge several grounds for reversal of the judgment: (1) The evidence is sufficient to sustain the verdict; (2) the instructions are erroneous; (3) incompetent evidence was admitted over their objections; and (4) the verdict is excessive. Ground (1) is not seriously argued, but in order that the other grounds may be clearly understood the evidence will be set forth at some length.

At the time of his arrest on March 13, 1944, the appellee, Clyde Vanhoose, was a member of the armed forces of the United States, and was on a visit to his home in Perry County on furlough. Accompanied by his uncle, Ison Vanhoose, he went to Hazard, arriving there between 12 and 1 p. m. They went to a restaurant known as George's Restaurant, operated by George Charos and Hattie Charos, his wife, and remained there until after 4 p. m. Beer was sold at the restaurant, but no spirituous liquors. Hattie Charos testified that appellee and his uncle sat down in a booth on the left side of the restaurant and drank eight or ten bottles of beer. A girl joined them at the table, and later she left and a second girl joined them. One of the girls left the restaurant twice and on each occasion returned with a quart of whisky. The crowd was boisterous, and appellee was cursing. Mrs. Charos directed one of her employees to call the police, and Alonzo Burns soon arrived. He talked to appellee and his uncle, and they left the restaurant. Mrs. Charos testified that appellee was drunk when he left. Alonzo Burns testified that he went on duty at 4 p. m., and shortly thereafter received a call to go to George's Restaurant. He found appellee and Ison Vanhoose standing in the aisle and saw a broken whisky bottle on the floor. He asked them if they would leave and go home, and appellee said they would. Later Burns received a call to go to Abe Turner's Restaurant on Main Street, and, accompanied by Bill Couch, he went to the restaurant where he found appellee and Ison Vanhoose. Abe Turner, proprietor of the restaurant, testified as follows as to what occurred:

"Q. Before the officers came did the plaintiff, Clyde Vanhoose and his uncle, Ison Vanhoose, come in your restaurant? A. Yes, sir.

"Q. Tell the jury just what they did in the way of ordering things to eat and drink, what took place? A. Well, when there the boy didn't order anything to drink neither one did. Ison ordered 15 hamburgers, I noticed him, he went to the door and looked out. In the meantime there was a lady sitting at the first booth, she got the boy down in the seat beside her and bought him a bottle of beer. I spoke to the girl about selling anybody anything to drink that was already intoxicated. While I was talking to the girl about the drink, she said 'I sold it to the lady.' The lady got up to put some money in the music box, and she dropped it and while I was reaching down to pick the money up Mr. Burns and Mr. Couch walked in, Ison was sitting next to the cash register. Mr. Burns walked over and put his hands some place on his body and said 'I thought I told you to go home' and Mr. Couch leaned up against one of the booths where the lady and this boy was sitting and Ison was across about three feet from them and Mr. Burns said 'I will have to arrest you,' this boy says 'you ain't going to arrest anybody,' Bill Couch said 'take it easy, soldier nobody is going to bother you.' About that time it started, the boy came out of his seat and Alonzo hit the counter, I was standing by the cash register, I grabbed the cash register to keep it from falling. They both got hold of each arm and took him out."

He said Clyde Vanhoose and Ison Vanhoose were intoxicated, and when asked if he saw anything that happened after the policemen and Clyde left the restaurant, he answered: "Yes, sir. I saw them one on each side of Clyde Vanhoose, he was using his feet to trip them. He throwed his weight on Alonzo Burns and then he would trip them, they did that until they got to the curb. I did see Couch try to pull Clyde's hands from Alonzo Burns' eyes, my wife came and got me, the last I saw they were getting in the car."

Appellee testified that he drank three bottles of beer at George's Restaurant but no whisky, and that he was sober. When a policeman arrived there and threatened to arrest Ison Vanhoose, appellee asked if

he could take his uncle to his home which was in the country and the policeman permitted them to leave. They stopped at Turner's Restaurant to purchase sandwiches, and while there Couch and Burns entered. Concerning what occurred then, appellee testified as follows:

"Q. What did these officers do or say to you when they came in there? A. He said to my uncle, you are under arrest, this time. I asked if I could take him home, and he said 'you are going too,' and hit me across my nose with his fist.

"Q. Were you drunk or sober? A. I was sober.

"Q. Had you done anything to Bill Couch? A. No, sir. Not a thing.

"Q. Had you done anything to Alonzo Burns? A. No, sir. Not a thing.

"Q. After Bill Couch struck you in the nose, what did he do? A. He grabbed hold one arm and Alonzo got hold the other and drug me up the street.

"Q. What did they do with you after they got you out? A. After they got me to the curb my hat came off, I said 'let me get my hat,' he said 'no, someone else will get your hat.' I reached down to get my hat, we all three fell and they jerked me up and they both threw me down again, Alonzo jumped on my stomach and Bill hit me with a blackjack.

"Q. Did you do anything? A. No, sir. I couldn't."

Ison Vanhoose testified that he and appellee went into George's Restaurant between 12 and 1 o'clock in the afternoon, and while there each of them drank four or five bottles of beer. He purchased two quarts of whisky, but he didn't see appellee drink any of it. He testified in part:

"You drank something else besides beer while you were there? A. Probably I did.

"Q. Don't you know you did? A. I might have.

"Q. Did you send somebody out to get some whisky? A. Georgia went and got a quart of whisky.

"Q. Where did she bring it to? A. To the booth.

"Q. How many was there at that time. A. Four of us.

"Q. Tell the jury, if you know, who paid for that whisky? A. I paid for it.

"Q. What became of that quart of whisky? A. The biggest part went to the back in glasses.

"Q. All right, did you give Georgia money another time? A. Yes, sir.

"Q. What did she do with that? A. She went and got whisky with it, I busted the bottle.

"Q. You had already opened it and some of it had been drunk? A. I didn't open it somebody did.

"Q. That is two quarts, did you send for anymore? A. No, sir.

"Q. You had a conversation with Mr. Couch or Mr. Burns one before you and your nephew left there, did you not? A. Yes, sir.

"Q. You remember what the officer said to you? A. As far as having talked with them when he came in, Georgia talked to him. And showed him the first quart of whisky she had in the poke.

"Q. What did they say to you? A. Alonzo came in, he asked me if I would go home, I told him I would and the boy said he would take me home. We came to the other restaurant, and I stopped to get some sandwiches to take home.

"Q. Did they make sandwiches at the other place? A. Yes, sir.

"Q. Why didn't you get them at the first place? A. I never asked them, I always get them down here, while we was waiting a woman called to Clyde and wanted him to drink a bottle of beer and he wouldn't. After I got the sandwiches, I said 'lets go,' and she said 'he hasn't drank his beer yet,' I was setting there waiting on him when Mr. Couch and Alonzo came in.

"Q. Wasn't beer served to all of you. A. No, sir. I didn't drink a drop.

"Q. How long did you stay there in Turner's Restaurant? A. Not but a few minutes.

"Q. Did you notice any difficulty there between Clyde Vanhoose and Mr. Burns and Mr. Couch? A. Burns came up to him and Couch came along by my side and the argument started there.

"Q. Was there any difficulty, and wrestling between Burns and Clyde? A. Not at the start.

"Q. What did Clyde say to the officers when they undertook to arrest you? A. I don't remember.

"Q. Was Mr. Turner there? A. Yes, sir.

"Q. After the men got out on the sidewalk and came on up this way you didn't see anything that happened there? A. No, sir."

Mrs. William Cornett, Hiram Napier and Mrs. Hiram Napier, witnesses for appellee, testified that they saw the two policemen, with appellee between them, cross the street from Turner's Restaurant. They fell twice while crossing the street. One of the witnesses described the occurrence as follows: "Burns was trying to hold him down. They raised up from there and came on this side and went down again, they all three fell down on the concrete again. Burns got on top of his stomach and was holding him by the shoulders, and Bill walked around to the boy's head and got him by the hair of the head and got him by the hair and jabbed his head up and down."

Burns and Couch denied that either of them struck appellee with a blackjack. Couch described the occurrence from the time he and Burns entered the Turner Restaurant as follows: "The older Vanhoose was setting at the second stool. He had taken a bite of the hamburger and his head was laying over and the hamburger by his mouth and Alonzo said, 'old fellow straighten up a little bit,' he said 'I thought you were going home, and he said I am going to have to arrest you' and someone said you ain't going to arrest no God-dam person in here and I walked over there and saw a soldier, he got up and made an attack on Mr. Burns and pushed him over, I tried to pull him loose and I hit him with my fist and he turned him loose and as we came out he was kicking this way and that and he was bucking like a bronco. He said if you sons of bitches will turn me loose I will walk, he kicked me in the groins, I was a little bit dazed and I got hold of him again and we wrestled along, I couldn't take like Alonzo. Alonzo and he fell and they went down together. He tripped Alonzo and we got him up there and we went on the other side. I couldn't hold on like Alonzo and they went down again, he seemed to be the

best man and he was on top of Alonzo and had his hands in Alonzo's eyes and broke his glasses. I took hold of his hair and pulled him over this way and he released his hold and Olin Turner got hold of him and put him in the car.

"Q. Did you see Paul Gross there? A. Yes, sir. He said 'soldier why don't you get in the car and act like a man' and he kicked Paul clear back on the street."

Mrs. F. F. Shelton, wife of a dentist, was in her husband's office in the Citizens Bank Building. Her attention was called to the difficulty, and she testified:

"Q. You remember the occasion when the police had some difficulty with a soldier down the street, below your husband's office? A. Yes, sir.

"Q. Were you in the dentist office at the time? A. Yes, sir.

"Q. Was your attention called to the difficulty down on the street by anyone in your office? A. Yes, sir.

"Q. Did you see any of the difficulty? A. Yes, sir.

"Q. From the window of your office there? A. Yes, sir.

"Q. All right, tell the jury when you looked out the window what you saw going on? A. I saw a police lying flat on his back and a soldier boy was on top of him, and he was pounding him in the stomach with his knees.

"Q. Could you tell which policeman it was? A. No, sir.

"Q. What corner was it you saw them? A. They were near this sidewalk here.

"Q. What was their position on the street, were they near the passage way? A. It looked like they blocked the passage.

"Q. Did you see anything else? A. No, sir. I got sick and turned away."

Both Burns and Couch were seriously injured in the affray, and were treated by Dr. Paul W. Gutsche who testified in part: "On the day of this difficulty or very soon thereafter did you have occasion to treat, examine or prescribe for Alonzo Burns? A. I did.

"Q. State whether or not you made any X-rays or physical examination of the man? A. He came to me complaining of pains in his chest. I found a large area of bruises on the left chest wall and I fluoroscoped him and found three broken ribs. We strapped him and he was under treatment for two or three weeks.

"Q. Did you see any lacerations on his face at that time? A. He showed me some glasses and I told him he was fortunate not to have his eyes injured.

"Q. Soon after this affair on the street, were you consulted by and did you treat the policeman, William Couch? A. Yes, sir. I did. It was several days after I saw Alonzo Burns.

"Q. What was his condition? A. He had quite a bruise on his lower leg. It involved the place that was previously injured. We had a good bit of trouble clearing this trouble up.

"Q. Did you continue to treat Couch for a period of time? A. Yes, sir. And referred him to Louisville to a specialist."

Couch said that his hospital and medical bills amounted to $700.

The overwhelming weight of the testimony, much of it by disinterested witnesses, was to the effect that appellee was drunk and disorderly and resisted arrest. Appellee, however, testified to the contrary, and an issue was made for the jury's determination.

In Instruction No. 1 the court submitted both the question of false arrest and the question of unnecessary force if the arrest was lawful. Instruction No. 2 defined the duties of the policeman and the plaintiff, but it was incorrect in that it failed to tell the jury that the defendants, as policemen of the City of Hazard, had the right to arrest plaintiff if they had reasonable grounds to believe, and did believe in good faith, that the plaintiff, at the time the arrest was made, was drunk or disorderly or was attempting to prevent the arrest of Ison Vanhoose. Goins v. Hudson, 246 Ky. 517, 55 S. W. 2d 388; Easton v. Commonwealth, 82 S. W. 996, 26 Ky. Law Rep. 960. Instruction No. 3 read: "If you find for the plaintiff you will find for him such a sum in damages as will fairly and justly compensate him for such mental pain and anguish, if any, suffered and endured by him, and

for such physical pain and suffering, if any, endured by him, on account of said arrest and imprisonment or on account of any beating and bruising, if any, inflicted by the defendants or either of them on the plaintiff; but if you find for the plaintiff your finding in all will not exceed the sum of $17,000.00, the amount claimed in the petition.''

This instruction was correct when applied to the first paragraph of Instruction No. 1 if the jury believed that the plaintiff's arrest was unlawful, but standing alone it authorized the jury, if they believed that the arrest was lawful but unnecessary force was used, to make a finding for all mental and physical suffering of the plaintiff resulting from the beating and wounding of the plaintiff by the defendants, Couch and Burns, whereas it should have limited the recovery under these circumstances to such mental and physical suffering as resulted from such beating and wounding as was in excess of what was necessary to be inflicted by the defendants, Couch and Burns, in order to effect the arrest or to retain plaintiff in their custody after the arrest or to repel any assault by plaintiff upon them or either of them. Romans v. McGinnis, 156 Ky. 205, 160 S. W. 928; Foster v. Dukes, 301 Ky. 752, 193 S. W. 2d 159.

In an amended petition the plaintiff alleged that J. W. Fouts and Ross Blondell were sureties on the bond of the defendant Alonzo Burns. Fouts and Blondell were made defendants, and they filed a separate answer admitting that they were sureties on the bond. The plaintiff introduced Miss Eleanor Jarvis, custodian of the City records, and examined her concerning the records in her custody showing that Alonzo Burns had executed bond with Fouts and Blondell as sureties. Objections to most of the questions were sustained and avowals were made, but none of this proof was necessary or relevant and should have been omitted. There was no issue between the plaintiff and Fouts and Blondell. They admitted they had signed the bond as sureties, and it followed that their liability depended upon the outcome of the trial between the plaintiff and the defendant Burns. Turner v. Smith, 313 Ky. 635, 232 S.W.2d 1006; Romans v. McGinnis, supra.

If appellee was injured in the difficulty, his injuries were slight. He testified that he received a black eye, an

abrasion on his cheek, and a knot on his head. There was evidence that he had the black eye and the abrasion when he entered George's Restaurant, and that he received them in a fight on the previous day. Chester Jennings, chief of police, learned of the difficulty and visited appellee in the jail about an hour after the arrest. He asked appellee if he needed a doctor, and appellee said: "No, somebody else might be needing a doctor." Drew Faulkner was sent to the jail by the Defense Council to make an investigation. He testified in part:

"Q. Just tell what took place between Mr. Vanhoose and yourself? A. I asked the boy why he was in there, he said the police put him in. I asked him if he was hurt and needed a doctor and he said no. He had a black eye and a skin place on his face.

"Q. You learn from him how long he had been in jail? A. Yes, sir. He said he was put in that afternoon.

"Q. What was the condition of his clothing? A. They looked like they were soiled, like anybody's clothes would be from ordinary wear."

The only serious injuries resulting from the difficulty were received by the defendants, Couch and Burns. In view of all the evidence, we conclude that the verdict is grossly excessive.

Judgment is reversed.